Filed 8/21/25  P. v. Fegan CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> STEPHEN RUSSELL FEGAN, <br><br> Defendant and Appellant. | F088324 <br><br> (Super. Ct. No. SUF18939) <br><br><br> **OPINION** |

-ooOoo-

## THE COURT*

APPEAL from an order of the Superior Court of Merced County.  Paul C. Lo, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Levy, Acting P. J., Meehan, J. and Fain, J.†

†       Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# INTRODUCTION

In 1995, appellant and defendant Stephen Russell Fegan (appellant) was convicted of two counts of first degree murder with special circumstances for killing his estranged wife and her boyfriend with an axe and a knife in the presence of his young child. He was sentenced to two consecutive terms of life in prison without the possibility of parole (LWOP), and the judgment was affirmed on direct appeal. Thereafter, appellant has filed numerous petitions seeking reversal of his convictions and/or resentencing of his LWOP sentences, all of which have been denied.

In this case, appellant filed his own "motion" for the trial court to recall his LWOP terms pursuant to Penal Code[1] section 1172.1 and asserted his continued incarceration was no longer in the interests of justice. As will be explained, appellant was not statutorily authorized to file his own motion for recall under section 1172.1, the trial court was not required to respond to the motion, and an appeal from the court's summary denial of his motion is not an appealable order. We therefore dismiss this appeal.

# FACTS[2]

"In December 1993, appellant and his wife, Teresa Leonard (Leonard), separated. They had one child. Appellant relocated to Roseville and moved in with his father. Leonard and their minor child moved to Merced and lived with James Hartery (Hartery).

---

[1]     All further statutory citations are to the Penal Code.

[2]     The clerk's transcript in the instant appeal contains the nonpublished opinions filed in appellant's prior appeals in *In re Fegan* (Feb. 14, 2020, F079667), which dismissed as untimely his appeal from the trial court's denial of his petition for writ of habeas corpus; *People v. Fegan* (Aug. 3, 2021, F081054), which affirmed the trial court's denial of his first and second petitions for resentencing filed under former section 1170.95 (later renumbered as section 1172.6); and *People v. Fegan* (Oct. 13, 2023, F083705), which affirmed the trial court's denial of his fifth and sixth petitions for resentencing under section 1172.6, and also took judicial notice of the record and nonpublished opinion in *People v. Fegan* (Dec. 31, 1997, F025279) that affirmed his convictions on direct appeal. The following factual and procedural summaries are from these opinions.

"Sometime around 4:30 a.m. on March 8, 1994, appellant's father got up and discovered appellant was gone and had taken his father's car without permission. Appellant's father contacted the Roseville Police Department because he was worried that appellant was desperate and might confront Leonard; he reported the stolen vehicle.

" 'On the morning of March 8, 1994, [appellant] drove from his father's home in Roseville … to the home of … Hartery in Merced. [Leonard and their minor child] had recently moved in with Hartery. Coupled with Leonard's romantic relationship with Hartery, this turn of events caused [appellant] great distress and anger. When [appellant] arrived at Hartery's home, he threw two Molotov cocktails through a front window and into Hartery's living room. [Appellant] then entered the home through the broken window. Awakened perhaps by the sound of breaking glass or the smell of fire from one of the incendiary devices, Hartery made his way into the living room. [Appellant] attacked him from behind, hitting Hartery in the head with an axe and then, with a knife, stabbing Hartery first in the back and later in the chest. Leonard also entered the living room; appellant chased her into another room of the house and stabbed her three times in the back. At some point, [appellant] took his [child], left Hartery's home, and drove away. Hartery and Leonard died from the wounds [appellant] inflicted.' [Citation.]

"At approximately 7:00 a.m., appellant drove up to his father's house in Roseville. An officer was there and talking to his father about his earlier report. Appellant entered the house, looked at his father, and started crying. There was a large amount of blood on his clothes. Appellant was wearing a work glove on his right hand, blood was dripping out of the glove, and there was a cut on his hand. Appellant's four-year-old child was with him. There was blood on the child's legs, but he was not physically injured. The child appeared to be in shock and said he had seen a fire and a fight.

"There was blood throughout the interior of the father's car. A red gasoline can was found in the car, and appellant's father said it had been kept in his garage. Appellant's father reported his axe and a couple of his Mason jars were missing.

3.

"An axe and a knife were found at the crime scene. The axe had glass particles in the handle and was identified as belonging to appellant's father. The blood on the axe head was identified as primarily belonging to appellant, with small amounts from a mixture of Leonard and Hartery. The knife's handle contained the blood of appellant, and Leonard and Hartery's blood was on the blade. The landlord of Hartery's house testified she often visited the residence, was familiar with the kitchen, and had never seen that knife there.

"Appellant was immediately taken into custody at his father's house and transported to the police department. When an officer walked past the jail's booking room, appellant asked if he could talk to him. After being advised of and waiving his constitutional rights, appellant calmly and deliberately told the officer, ' "I don't know what happened to me. I don't know why I did what I did. I'm not crazy or anything, but I must have been out of my mind.... [¶] ... [¶] I just don't know why I had to do this now ...." ' [Citation.]

"Appellant was booked into the county jail. During a visit with his father, appellant told him that he threw the axe through Hartery's window and entered the house through the broken window. He wrestled with Hartery, Leonard was stabbed in the back with the knife while he was struggling with Hartery, he continued to wrestle with Hartery, and he was knocked down. Appellant said he picked up the axe and hit Hartery in the head."[3]

---

[3]     Appellant did not testify at trial and introduced an expert who testified about his mental state. In closing argument, the prosecutor argued the evidence showed appellant decided to kill Leonard and Hartery, " '[h]e devised a plan and carried it out, murdering [them] in a most brutal manner,' " and the People proved beyond a reasonable doubt that appellant committed premeditated murders.

In defense counsel's closing argument, he conceded that " '[w]hat [appellant] did was absolutely wrong,' " the homicides were not justifiable, and appellant " 'doesn't come in here claiming to be innocent. [Appellant] is guilty.' " Defense counsel argued appellant suffered from a mental disease, he did not intend to kill Leonard and Hartery,

**Convictions and Sentence**

On December 13, 1995, after a jury trial, appellant was convicted of counts 1 and 2, the first degree murders of Leonard and Hartery (§ 187). The jury found true the special circumstances that the murders were committed in the commission, attempted commission, or immediate flight after the commission of a burglary (§ 190.2, subd. (a)(17)(vii)) and an arson (*id*., subd. (a)(17)(viii)); and multiple murders were committed (*id*., subd. (a)(3)). As to count 1, the jury found true that appellant personally used a deadly or dangerous weapon, a knife, in the murder of Leonard; and as to count 2, he used both a knife and an axe in the murder of Hartery (§ 12022, subd. (b)).

Appellant was also convicted of count 3, burglary (§ 459), count 4, arson of an inhabited structure (§ 451, subd. (b)), and count 5, unlawfully taking a child without a legal right (§ 277).

On January 16, 1996, appellant was sentenced to an aggregate determinate term of nine years four months for counts 3, 4, and 5, to be served first. As to each of counts 1 and 2, the trial court imposed consecutive, indeterminate LWOP terms, plus one year for the personal use enhancements.

**Direct Appeal**

In 1997, this court affirmed the judgment on direct appeal, and held there was overwhelming evidence to support the jury's findings of premeditation and deliberation for appellant's two convictions of first degree murder. " 'Much of the planning evidence came from [appellant's] own words in response to questions posed by a defense investigator. The trial court admitted a transcript of the taped interview conducted in April 1994 into evidence and without limitation.' " " 'The multiple stab wounds and the brutality of [appellant's] attack on both victims support a finding of premeditated murder

---

the People failed to prove premeditation and the special circumstances, and the homicides constituted manslaughter and not murder because appellant might have believed he had just cause to take his child.

in each instance. [Citation.]' [Citation.] '[Appellant] used the items he took from his father's home to facilitate his attacks on both of his victims. After using the axe to render Hartery helpless, [appellant] repeatedly stabbed him in the back, puncturing Hartery's liver. He also slit Hartery's throat, severing his carotid artery and jugular vein. Later, after killing his wife, [appellant] again attacked Hartery by stabbing him in the chest so as to puncture the lung and sever the heart vessels. [Appellant] left the knife in Hartery's chest. [¶] After his initial attack on Hartery, [appellant] chased his estranged wife from the living room to the dining room. When he caught up with her, he stabbed her in the back, cutting two ribs and puncturing the lung and aorta. She suffered a total of three stab wounds.' [Citation.] '[T]here was more than enough evidence to justify a conclusion that [appellant] killed his victims willfully as well as with premeditation and deliberation so as to warrant the jury's return of both first degree murder verdicts.' "

**Postjudgment Petitions**

Starting in 2019, appellant filed petitions in the trial court for writ of habeas corpus, and successive petitions for resentencing pursuant to former section 1170.95 (later renumbered as section 1172.6). The trial court denied the habeas petitions. The court also denied appellant's multiple section 1172.6 petitions because he was not convicted under a felony-murder theory, and he was the actual killer convicted of two counts of premeditated and deliberate murder with special circumstances. Appellant filed appeals from these rulings; one of his appeals was dismissed as untimely. In his appeals from the trial court's denials of the section 1172.6 petitions, this court affirmed the trial court's rulings.

**APPELLANT'S CURRENT MOTION**

On or about June 12, 2024, appellant filed a "motion," in propria persona, for the trial court to recall his two LWOP sentences pursuant to section 1172.1, because "[e]xisting law authorizes the court to consider post-conviction factors, including [evidence] that reflects that circumstances have changed since the original sentencing so

6.

that continued incarceration is no longer in the [interest] of justice." Appellant asserted the trial court had to grant the motion based on postconviction factors because he did not have any major disciplinary violations in the past 30 years, and he had been programming, working, and taking classes, and filed supporting documents.

On June 17, 2024, the trial court filed an order that summarily denied appellant's "motion" because under section 1172.1, "any recall and resentencing may only be initiated by the court or specified authorities. [Appellant] is not a party who is authorized to make this request. The court declines [appellant's] invitation to recall and resentence."

On June 28, 2024, appellant filed a notice of appeal from the trial court's ruling.

## DISCUSSION

Appellant seeks remand to require the trial court to address the merits of his section 1172.1 motion for recall and resentencing. However, appellant cannot avoid the preliminary requirement that he could not file his own motion under section 1172.1, and the trial court's denial of his motion is not an appealable order.

## A. Section 1172.1

"Section 1172.1 provides authority for a trial court to recall the sentences of incarcerated defendants and resentence them under certain circumstances. Like its predecessor provisions (previously codified in § 1170, subd. (d)(1) and § 1170.03, subd. (a)), section 1172.1 is a statutory exception to the general rule that ' "once a judgment is rendered and execution of the sentence has begun, the trial court does not have jurisdiction to vacate or modify the sentence." ' " (*People v. Hodge* (2024) 107 Cal.App.5th 985, 992 (*Hodge*).)

"Under section 1172.1, a trial court may recall a sentence and resentence a defendant 'at any time' upon the recommendation of various designated correctional or law enforcement authorities. [Citation.] The trial court may also do so 'on its own motion' within 120 days of the date of commitment. [Citation.] Pursuant to an amendment effective January 1, 2024, a trial court now also has jurisdiction to recall a

7.

sentence and resentence a defendant on its own motion 'at any time if the applicable sentencing laws at the time of original sentencing are subsequently changed by new statutory authority or case law.' " (*Hodge*, *supra*, 107 Cal.App.5th at p. 992.)

"Section 1172.1 clearly assumes that at least some trial court orders applying its provisions will be appealable. Subdivision (d) of that section requires that, '[a]fter ruling on a referral authorized by this section, the court shall advise the defendant of their right to appeal and the necessary steps and time for taking an appeal.' However, neither that subdivision nor any other portion of section 1172.1 explicitly establishes a right to appeal." (*Hodge*, *supra*, 107 Cal.App.5th at p. 992.)

"[S]ection 1172.1 contains several explicit limitations on a defendant's rights and on a trial court's duty to act .… [¶] Section 1172.1 expressly denies defendants the right to file a petition for resentencing under that section, and expressly excuses the trial court from acting on any such request that a defendant might nevertheless file. Subdivision (c) makes this clear: 'A defendant is *not entitled* to file a petition seeking relief from the court under this section. If a defendant requests consideration for relief under this section, the court is *not required* to respond.' " (*Hodge*, *supra*, 107 Cal.App.5th at p. 993, italics added.)

## B.  *Hodge, Faustinos,* **and** *Roy*

In *Hodge*, the defendant filed his own motion for the trial court to recall his sentence under section 1172.1. The trial court denied the motion, and *Hodge* dismissed the defendant's appeal because it was from a nonappealable order. "[A] trial court's order declining to exercise its discretion under section 1172.1 to recall a defendant's sentence on its own motion after receiving the defendant's unauthorized request for such relief does not affect the defendant's substantial rights under section 1237, subdivision (b)," and it is not an appealable order. (*Hodge*, *supra*, 107 Cal.App.5th at p. 999.) "[T]he second sentence of section 1172.1, subdivision (c) … undermine[s] any claim that defendants have a substantial right at stake when they file an unauthorized request for

8.

resentencing.  That sentence excuses the trial court from any responsibility to rule on such a request, or even to respond.  It follows that a defendant who chooses to file an unauthorized request for resentencing has no *right* to a ruling.  The defendants may have a liberty interest at stake in any decision as to whether they should remain incarcerated.  But a defendant has no right to demand that the trial court actually make such a decision.  If the defendant has no right to a decision, the trial court's choice not to make one does not deprive the defendant of any right, much less a substantial one."  (*Hodge*, *supra*, at p. 996.)

In *People v. Faustinos* (2025) 109 Cal.App.5th 687(*Faustinos*), the court agreed with *Hodge* and held "an order declining to act on a defendant's unauthorized section 1172.1 petition is nonappealable."  (*Id*. at p. 693.)  *Faustinos* further held that "a defendant has a remedy if a trial court wrongly declares that it lacks jurisdiction to act on its own motion under section 1172.1.  That remedy is to petition for a writ of habeas corpus in the trial court."  (*Id*. at pp. 698–699.)

In *People v. Roy* (2025) 110 Cal.App.5th 991 (*Roy*), the court adopted the reasoning of *Hodge* and similarly held "a trial court order denying or dismissing a defendant-initiated request under section 1172.1 is not appealable because the trial court had no statutory obligation to act on defendant's request and thus the order did not affect a defendant's substantial rights under section 1237, subdivision (b)."  (*Id*. at p. 994.)

## C.  Initial Briefing

In the initial briefing on appeal, appellant argued that he could file his own motion for recall and resentencing under section 1172.1, and requested remand for the trial court to consider the merits of his motion and whether there was "the penal necessity of his incarceration after more than 30 years," since his documentary evidence allegedly showed his rehabilitation.  Appellant did not address *Hodge*.

In response, the People relied on *Hodge* and asserted that section 1172.1, subdivision (c) expressly stated appellant could not file a petition on his own motion, the

9.

trial court was not required to respond, and the court's denial of appellant's request was not an appealable order.

In his reply brief, appellant argued the trial court's summary denial was an appealable order based on this court's opinion in *People v. Chatman* (F087868, rehg. granted March 3, 2025), which held an order denying a defendant's section 1172.1 request for recall and resentencing was an appealable order.

## D. *Chatman's* Grant of Rehearing

On March 3, 2025, while this appeal was pending, this court granted the People's petition for rehearing in *Chatman* and vacated the previously published opinion. On April 21, 2025, this court filed a nonpublished opinion after rehearing in *Chatman* and held the trial court's order was not appealable. (*People v. Chatman* (Apr. 21, 2025, F087868).)

## E. Supplemental Briefing

On May 16, 2025, this court sent a briefing order to the parties to address the impact on the issues in this appeal of the decisions in *Faustinos* and *Roy*, and this court's decision to vacate the opinion in *Chatman* and file the nonpublished opinion.

In supplemental briefing, the People again asserted the trial court's order was not appealable based on *Hodge*, *Roy* reached the same conclusion, and the published opinion in *Chatman* had been vacated and no longer had precedential value.

Appellant cited to authorities that addressed other recall and resentencing statutes, and argued that since he filed "an authorized and evidence-supported invitation for relief" under section 1172.1, he should be permitted to appeal from the trial court's summary denial because it implicated his substantial rights. "Otherwise, in the context of the current conundrum of being allowed to solicit the court's consideration by invitation but with no right of review, many an otherwise deserving [appellant], like [appellant], will be simply a wallflower waiting for an authorized invitation that may never come."

10.

However, appellant conceded the previously published opinion in *Chatman* was no longer valid authority and, at this time, the trial court's order was not appealable under *Hodge*, *Faustinos*, and *Roy*. Appellant noted that *Faustinos* and the nonpublished opinion on rehearing in *Chatman* "endorsed the notion that filing a petition for writ of habeas corpus was an alternate proceeding in which a denied defendant might seek relief on the claims that would have been made under section 1172.1" and requested the same disposition in this case.

## F. Analysis

As explained in *Hodge*, *Faustinos*, and *Roy*, the trial court's summary denial of appellant's motion is not an appealable order. As acknowledged in *Faustinos*, appellant may file a petition for writ of habeas corpus in the trial court. (*Faustinos*, *supra*, 109 Cal.App.5th at pp. 698–699.)

## DISPOSITION

Appellant's appeal from the trial court's order of June 17, 2024, denying his motion for resentencing under section 1172.1, is dismissed.